UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JOHN HUGHES, III, #11998-007

    Petitioner,

v.                                       ACTION NO. 2:18cv159

J. RAY ORMOND, Warden,
and
UNITED STATES PAROLE
COMMISION,

    Respondents.

## UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

On January 29, 2018, the *pro se* petitioner, John Hughes, III, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 in the United States District Court for the District of Columbia. The case was then transferred to this Court on March 23, 2018. On June 11, 2018, respondents filed a response to the petition asking that the petition be dismissed. ECF No. 9. For the following reasons, the Court **RECOMMENDS** that the petition for a writ of habeas corpus, ECF No. 1, be **DENIED** and **DISMISSED WITH PREJUDICE**.

### I. FACTUAL AND PROCEDURAL HISTORY

On April 3, 1996, the Superior Court of the District of Columbia sentenced John Hughes, III ("Hughes"), an inmate currently confined at FCI Petersburg, to an aggregated, indeterminate sentence with a minimum term of 17 years and 20 months, and a maximum term of 56 years for: (1) 1st degree sexual abuse while armed; (2) possession of a firearm during a crime of violence; and (3) 4th degree sexual abuse. ECF No. 9-1 at 4–6. Hughes became eligible for parole on

March 23, 2014. ECF No. 9-1 at 7. On January 24, 2014, Hughes's underlying offenses were summarized by the D.C. Parole Board's prehearing assessment as follows:

> [T]he police were summoned to the scene of a reported shooting at 14th and H Streets N.E. Washington, D.C. While en route they were flagged down by several citizens who informed them that the offender had just shot a child in the 800 block of 14th Street N.E. Washington, D.C. The offender was returned to the scene of the shooting and was positively identified as the individual who had shot a 13-year old boy in the back. The victim's father reported to the police that he was driving the victim to the police station to report that the victim had been kidnapped at gunpoint and sexually molested, when they observed the perpetrator/offender. The victim and his father exited the vehicle and confronted the offender who had entered a restaurant. During the confrontation, the offender produced a gun and shot the child in the side.
>
> Details regarding the sexual assault(s) provided in the presentence report are sparse at best. The instant offenses entailed the offender sexually assaulting at gunpoint a 13-year old male victim on 10-21-1995, and a 15-year old male victim on 10-9-1995. Both victims were apparently threatened, abducted at gunpoint, and anally sodomized. One victim was struck in the back of the head with a gun and the other victim robbed of $80.00. The sexual assault of the 13-year old victim lasted for 2 hours.

*Id.* at 7, 11.

Pursuant to the D.C. Board of Parole's 1987 guidelines, the prehearing assessment calculated Hughes's initial point assignment grid score ("grid score") as a one. *Id.* at 8–10. This score factored in the degree and type of risk involved in the underlying offenses, while also including a one point reduction for institutional program achievement. *Id.* at 8–9. The prehearing assessment suggested that Hughes not be granted parole, concluding that, "[t]he D.C. Guidelines suggest that with a Total Point Score of 1 that the offender should be granted parole [but] [t]he predatory, violent, and brutal nature of the instant offenses suggests that the offender

2

is a more serious risk than what the guidelines suggest, and release on parole would pose a public safety risk."[1] *Id.* at 10.

On February 5, 2014, the examiner for the United States Parole Commission ("USPC") conducted Hughes's initial parole hearing and adopted the recommendation and grid score that were determined in the prehearing assessment. *Id.* at 12–13. The examiner suggested that parole be denied in Hughes's case because he remained "a more serious risk because [his] offense involved unusual cruelty to vulnerable victims, in which [he] gained their trust and sexually assaulted them." *Id.* at 13. Further justifying his recommendation, the examiner also stated that the fact that the second victim was shot in the back, and that Hughes had a prior conviction for sexual misconduct, suggest that continued incarceration was warranted. *Id.* In a notice of action dated May 5, 2014, the USPC notified Hughes that it denied parole and scheduled a reconsideration hearing for February 2017, 36 months from Hughes's initial hearing date.[2] *Id.* at 14–15.

On December 20, 2016, a second prehearing assessment was conducted in anticipation of Hughes's reconsideration hearing. *See id.* at 16–18. The second prehearing assessment made note of the previous USPC findings and the grid score of one. *Id.* at 17. The assessment stated that the score remained a one because, "[t]he Prisoner has not demonstrated any Program Achievement since Last Hearing." *Id.* Following a January 30, 2017 hearing, in a March 6, 2017 notice of action, the USPC denied parole, finding in pertinent part:

---

[1] The 1987 guidelines state that if the offender has a score of 0–2 at the initial hearing, parole shall ordinarily be granted. *See Ford v. Massarone*, 208 F. Supp. 3d 91, 97 (D.D.C. 2016). At a reconsideration hearing, if the offender's score is 0–3, parole shall ordinarily be granted. *Id.*

[2] The original notice of action, dated May 5, 2014, ECF No. 9-1 at 14, stated that the reconsideration hearing would take place 36 months after Hughes's parole eligibility date of March 23, 2014. The USPC corrected the date in its amended notice of action, dated June 27, 2016, *id.* at 15, to reflect that the reconsideration hearing was to take place 36 months after the February 5, 2014, initial hearing date.

3

> Your Grid Score at your last hearing was 1 point(s). You continue to be scored under the 1987 guidelines of the D.C. Board of Parole.
>
> Under the guidelines for D.C. Code offenders, your current Grid Score includes -1 point for ordinary program achievement since your last hearing.
>
> With adjustments reflecting your institutional record since your last hearing, your current Grid Score is 0. You continue to be scored under the 1987 guidelines of the D.C. Board of Parole. The guidelines indicate that parole should be granted at this time. However, a departure from the guidelines at this consideration is found warranted because the Commission finds there is a reasonable probability that you would not obey the law if released and your release would endanger the public safety. You are a more serious parole risk than shown by your Grid Score because [t]he reasons in the Notice of Action dated 5/05/2014 are still appropriate and you are still a more serious risk because your offense involved unusual cruelty to vulnerable victims in which you gained their trust and sexually assaulted them. During a struggle with the second victim's father the victim was shot in the back. Based on your abuse of two separate minor victims in the instant offense and your prior conviction for similar sexually deviant behavior with another vulnerable victim, the Commission views you as a high risk to repeat similar behavior if released on parole at this time. You have not completed enough significant programs to address your offense behavior such as the residential sex offender treatment offered by the Bureau of Prisons.

*Id.* at 19.[3]

On January 29, 2018, Hughes filed his petition for a writ of habeas corpus in the United States District Court for the District of Columbia. ECF No. 1. The petition was then transferred to this Court on March 23, 2018. ECF No. 4. Hughes alleges that the USPC violated his Eighth and Fourteenth Amendment rights when it denied him parole at the January 30, 2017, reconsideration hearing. ECF No. 1 at 8–10. Specifically, Hughes argues that:

(1) The USPC did not have the authority to consider his underlying offense behavior when making its decision to deviate from the 1987 guidelines at the reconsideration hearing.

---

[3] Although the notice of action references a January 30, 2017, reconsideration hearing, neither party has supplied a copy of the examiner's post hearing assessment, as was attached for the February 5, 2014, initial hearing assessment. *See* ECF No. 9-1 at 12.

4

ECF No. 1 at 9–10. Hughes states that, "[s]uch a practice is known as double-counting and constitutes an abuse of discretion." ECF No. 11 at 12 (emphasis omitted).

(2) The USPC acted arbitrarily by denying his parole on the basis of his failure to complete enough significant institutional programs such as the residential sex offender treatment program ("RSOTP"). ECF No. 1 at 8. *See also* ECF No. 11 at 13.

Ultimately, Hughes states that because the USPC abused its discretion, "[i]mmediate release is warranted dating back to the rehearing . . . ." ECF No. 1 at 10.

Respondents filed their response to the petition on June 11, 2018, asking the Court to dismiss the petition. ECF No. 9 at 11. Accompanying the response, respondents also filed and served Hughes with a *Roseboro* notice.[4] ECF No. 10. Hughes filed a reply to the response on June 28, 2018. ECF No. 11.

## II. ANALYSIS

### A. Standard of Review

#### 1. Revitalization Act and the 1987 Guidelines

In 1997, Congress overhauled the District of Columbia's government, including the parole system, through the National Capital Revitalization and Self-Government Improvement Act of 1997. Pub. L. No. 105-33, § 11231(a)(1), 111 Stat. 712, 745 (1997) ("Revitalization Act"). The Revitalization Act abolished the D.C. Parole Board and directed the USPC to conduct parole hearings for D.C. Code offenders "pursuant to the parole laws and regulations of the District of Columbia." *Id.* at § 11231(b)–(c). Accordingly, "since August 5, 1998, the USPC has conducted the hearings and decided the requests for parole of all persons convicted of

---

[4]In accordance with *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and Local Rule 7(K), Hughes was advised that his reply to respondents' response had to be filed within 21 days of the *Roseboro* notice's filing.

5

violating the D.C. Code." *Sellmon v. Reilly*, 551 F. Supp. 2d 66, 68 (D.D.C. 2008). Prior to the Revitalization Act, "the D.C. [P]arole [B]oard conducted the parole hearings for D.C. Code offenders, applying guidelines it formally adopted in 1985, and published in the District of Columbia Municipal Regulations in 1987." *Id.* at 69 (citing D.C. Mun. Regs., Title 28, §§ 204.1–204.22 (1987) (repealed Aug. 5, 2000)) ("1987 guidelines").[5]

Under the 1987 guidelines, the D.C. Parole Board, and subsequently, the USPC, determine parole eligibility by "employing an analytical framework that relie[s] on both pre- and post-incarceration factors."[6] *Id.* at 70 (citing D.C. Mun. Regs., Title 28, § 204.1 (1987)). The 1987 guidelines are "comprised of four factors, two of which utilize information known at the time of incarceration, the other two based on post-incarceration factors." *Id.* The factors considered under the 1987 guidelines include the degree of risk (measured by a separate salient factor score which considers among other things, prior convictions, age of the offender at the time of the underlying offense, and opiate dependence); the type of risk; institutional adjustment; and institutional program achievement. *See* D.C. Mun. Regs., Title 28, app. 2-1. These factors are considered in the calculation of a total grid score which serves as an actuarial tool to

---

[5]The 1987 guidelines and the associated appendices can be accessed at, https://www.justice.gov/sites/default/files/uspc/legacy/2009/12/31/parole-policy-guidelines.pdf. (last visited 7/31/2018).

[6]Currently, if a prisoner is to have a parole hearing conducted in accordance with the 1987 guidelines, several criteria must be met:

> (i) The prisoner committed the offense of conviction after March 3, 1985 and before August 5, 1998;
> (ii) The prisoner is not incarcerated as a parole violator;
> (iii) The prisoner received his initial hearing after August 4, 1998; and
> (iv) The prisoner does not have a parole effective date, or a presumptive parole date before January 1, 2010.

28 C.F.R. § 2.80(o)(2) (2018).

determine parole eligibility. *Id.* § 204.3. The 1987 guidelines direct that a parole request could be granted (with varying levels of supervision) at the initial hearing if an offender's grid score was 0–2, or denied if the grid score was 3–5.[7] *Id.* § 204.19. In the case of a parole rehearing, parole could be granted for a score of 0–3, or denied if the score was 4–5.[8] *Id.* § 204.21.

These guidelines, however, do not mandate an immediate grant of parole based upon a low score. Rather, the 1987 guidelines recognize that:

> The Board may, in unusual circumstances, waive the SFS [salient factor score] and the pre and post incarceration factors set forth in this chapter to grant or deny parole to a parole candidate. In that case, the Board shall specify in writing those factors which it used to depart from the strict application of the provisions of this chapter.

*Id.* § 204.22.

In such a case, the guidelines provide that, "[a]ny parole release decision falling outside the numerically determined guideline shall be explained by reference to the specific aggravating or mitigating factors as stated in Appendices 2-1 and 2-2." *Id.* § 204.1. Appendix 2-1 of the 1987 guidelines lists six pre-incarceration factors that, if applicable, demonstrate that the candidate presents a greater risk than reflected by his or her total point score. They are: (1) the offender repeatedly failed under parole supervision; (2) the current offense involved ongoing criminal behavior; (3) the offender had a lengthy history of criminally-related alcohol abuse; (4) the offender had a history of repetitive, sophisticated criminal behavior; (5) the offender had an

---

[7]Different characteristics regarding the inmate, his underlying offense, and his post-incarceration behavior are assigned varying points. *See* D.C. Mun. Regs., Title 28, app. 2-1. It is unnecessary to discuss the exact breakdown of the scoring system for the purpose of this report and recommendation. It is pertinent to note, however, that inmates receive a one point reduction for positive institutional program participation. *See id.*

[8]At a parole rehearing, the offender's new score is calculated under the 1987 guidelines by taking the score attached at the initial hearing, and either adding a point for negative institutional behavior since the last parole hearing, or subtracting a point for program achievement since the last consideration hearing. *See* D.C. Mun. Regs., Title 28, app. 2-2.

unusually serious prior record of at least five felony convictions; or (6) the offender's crime involved unusual cruelty to victims.[9] *See id.* app. 2-1. Appendix 2-2 lists three reasons for going outside the guidelines: (1) change in the availability of community resources leading to better parole prognosis; (2) poor medical prognosis; or (3) other change in circumstances.[10] *See id.* app. 2-2.

"In 1991, to ensure consistent and equitable application of the 1987 Regulations, the Board adopted . . . policy guideline[s] to define the terms used in the appendices to the 1987 Regulations." *Sellmon*, 551 F. Supp. 2d at 71. In pertinent part, the 1991 guidelines elaborate upon the circumstances in which the parole board could deny parole to an otherwise eligible offender. *See* 1991 Pol'y Guidelines § VI(C).[11] Particularly, the guidelines state that a departure based on an unusual cruelty to victims may apply where the offense involved:

> a. Physical, mental or emotional abuse beyond the degree needed to sustain a conviction on the instant offense; OR
>
> b. Especially vulnerable victims, e.g., children or elderly persons [that] were the victims of assaultive or fraudulent behavior.

*Id.* § VI(C)(6).

### 2. Judicial Review of Parole Decisions and Parole Board Discretion

As a preliminary matter, judicial review of parole decisions is extremely narrow. "[T]he Parole Act specifically commits the decision to grant or deny parole to the unreviewable

---

[9]Appendix 2-1 is a grid score work sheet that is used by parole board examiners to calculate an offender's parole eligibility at an initial parole hearing.

[10]Appendix 2-2 is a grid score work sheet that is used by parole board examiners to calculate an offender's parole eligibility at a reconsideration hearing.

[11]The 1991 policy guidelines can also be accessed at, https://www.justice.gov/sites/default/files/uspc/legacy/2009/12/31/parole-policy-guidelines.pdf. (last visited 7/31/2018).

8

discretion of the Parole Commission." *Garcia v. Neagle*, 660 F.2d 983, 988 (4th Cir. 1981). "[P]arole decisions are therefore not subject to arbitrary and capricious or abuse of discretion review . . . ."[12] *Page v. Pearson*, 261 F. Supp. 2d 528, 530 (E.D. Va. 2003). "[J]udicial review is limited to a consideration of whether the Commission 'exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations.'" *Wilson-Bey v. O'Brien*, No. 2:11cv59, 2012 WL 1190898, at *3 (N.D.W. Va. Feb. 27, 2012), *report and recommendation adopted by* 2012 WL 1190896 (N.D.W. Va. Apr. 10, 2012) (quoting *Garcia*, 660 F.2d at 988).

The D.C. Parole Board (and now, the USPC) was given ample discretion to depart from a parole decision suggested by a strict application of the 1987 guidelines. *Ellis v. District of Columbia*, 84 F.3d 1413, 1419–20 (D.C. Cir. 1996). The scoring system of the 1987 guidelines has been viewed "as merely a guide, and not a 'rigid formula,' and not a constraint on the discretion conferred upon the [b]oard by the parole statute." *Id.* at 1419 (citing *McRae v. Hyman*, 667 A.2d 1356, 1360–61 (D.C. 1995)). The "[b]oard is not required to either grant or deny parole based upon the score attained," rather, "if the [b]oard wished to disregard the results of the scoring system it merely had to say so in writing." *Id.*

---

[12]Some courts within the Fourth Circuit, however, have applied an abuse of discretion or arbitrary and capricious standard when considering a parole board's decision. *See, e.g., Cunningham v. United States Parole Comm'n*, No. 9:16-2847-RMG-BM, 2017 WL 9289410, at *3–4 (D.S.C. Apr. 18, 2017), *report and recommendation adopted by* 2017 WL 2061381 (D.S.C. May 12, 2017) (finding that judicial review of a parole board's decision under the 1987 guidelines was limited to the question of whether there was an abuse of discretion); *Williams-Bey v. Compton*, No. 7:03cv190, 2004 WL 3259004, at *1 (W.D. Va. Feb. 19, 2004) ("An agency's decisions are not to be second-guessed by federal courts unless they are arbitrary, capricious, or manifestly contrary to the statute."); *Floyd v. Reilly*, No. 02-395-AM, 2002 U.S. Dist. LEXIS 15262, at *13 (E.D. Va. Aug. 8, 2002) ("To determine whether the Parole Commission abused its discretion by not basing its decision on the evidence, a reviewing court need only determine whether the information relied on by the Commission is sufficient to provide a factual basis for its reasons.").

B.  **Hughes's double counting argument fails because the USPC did not consider the unusual cruelty of Hughes's underlying offense behavior when calculating his initial grid score.**

Hughes argues that, "[t]he [USPC] has . . . used the same aggravating factors [unusual cruelty toward victims] to continue a prisoner beyond the guidelines when such factors were used initially to place a prisoner in a particular severity category. Such a practice is known as double-counting and constitutes an abuse of discretion." ECF No. 11 at 12 (emphasis omitted). In reply, respondents argue that the USPC complied with the 1987 guidelines because it had a rational basis for denying parole and it stated its reasons in writing. ECF No. 9 at 7–8. Respondents go on to argue that, "[c]learly, Hughes's offense can, and must, be considered when assessing the risk to public safety if he is granted parole." *Id.* at 8. In accordance with *Garcia*, this Court cannot consider whether the USPC abused its discretion when making a parole determination. *See* 660 F.2d at 988. Because the USPC did not exceed its legal authority, act unconstitutionally, or fail to follow its own regulations when it considered the unusual cruelty of the underlying offense, Hughes's argument fails.

"Impermissible double counting occurs when the same factors used by the [USPC] to determine an inmate's [grid] score are used as a basis for departure from the guidelines." *Smith v. United States Parole Comm'n*, No. 7:05CV00120, 2005 WL 1594452, at *2 (W.D. Va. June 29, 2005) (citing *Floyd,* 2002 U.S. Dist. LEXIS 15262, at *9–11). Hughes alleges that, "[t]he [USPC] supported its determination [to deny parole] by citing aggravating factors which it found warranted longer incarceration," when such "aggravating factors were integral to his convictions as well as his placement in the severity category." ECF No. 11 at 11.

When determining an offender's initial grid score, the USPC addresses the offender's salient factor score, "Type of Risk Assessment," and post-incarceration behavior. D.C. Mun.

10

Regs., Title 28, app. 2-1. The salient factor score and post-incarceration behavior calculation do not consider the underlying offense. The "Type of Risk Assessment," however, considers whether: (1) the current offense involves a felony in which the offender caused or attempted to cause death or serious bodily injury; (2) the offender has two or more previous convictions for a similar violent felony; (3) the current offense involved the use of a dangerous weapon; (4) the offender has two or more previous convictions for a felony involving the use of a dangerous weapon; (5) the current offense involves the distribution, or intent to distribute, illicit substances; and (6) the offender has two or more previous convictions for significantly similar offenses involving the distribution of illicit substances. *Id.*

Under the 1987 guidelines, parole examiners do not consider the unusual cruelty of the underlying offense when calculating the initial grid score of an offender. Accordingly, in Hughes's prehearing assessment for his initial parole hearing, attached as Exhibit 4 of the respondent's response to the petition, there is no mention of unusual cruelty in the calculation of his initial grid score.[13] *See* ECF No. 9-1 at 7–10.

In similar cases within the Fourth Circuit, courts have consistently rejected habeas petitioners' claims that the USPC engaged in double counting by denying parole based on factors related to the nature or severity of the offense. *See, e.g., Blunt-Bey v. Perdue,* No. 5:13cv94, 2013 WL 6073496, at *8, 13–14 (N.D.W. Va. Nov. 18, 2013) (finding that the USPC did not err when it departed from the guidelines based on the offender's unusual cruelty of holding one victim at knifepoint against her will, and by stabbing another with an ice pick twice before snatching her purse and running away); *Lyons v. United States Parole Comm'n,* No. 3:08cv342,

---

[13] Hughes received a one-point increase because his offense involved a "felony in which the defendant caused, attempted to cause or threatened to cause death or serious bodily injury to another individual," and because his offense involved the use of a dangerous weapon. ECF No. 9-1 at 9.

2009 WL 211583, at *5 (E.D. Va. Jan. 28, 2009) (finding that the USPC did not double count by departing upward from the guidelines based on petitioner's premeditation in firing a shot in victim's direction and killing without provocation); *Smith*, 2005 WL 1594452 at *2 ("While the fact that [petitioner] committed a violent offense was used to increase his [grid] score by one point, this adjustment did not account for the nature or degree of violence actually involved.").

Hughes nonetheless argues that the USPC is not permitted under the 1987 guidelines to consider the underlying offense at a reconsideration hearing, even if the underlying offense involved unusual cruelty to vulnerable victims. ECF No. 1 at 9–10. To support his position, Hughes relies exclusively on a 1988 deposition of Gladys W. Mack (attached as Exhibit A to his motion for leave of court), allegedly a former chairperson of the D.C. Parole Board. *See* ECF No. 1 at 6–7, 10; ECF No. 12 at 7–36. The deposition transcript provided by Hughes, however, is incomplete, and Mack's testimony is not referenced in the court's opinion. *See Cosgrove v. Thornburgh*, 703 F. Supp. 995 (D.D.C. 1988).[14]

The Court need not address whether to consider an incomplete deposition from a 1988 case not involving Hughes as part of the record because petitioner's argument is not in accordance with the guidelines themselves, or the associated case law. Although the "unusual cruelty to victims" factor is listed in Appendix 2-1, which includes an initial hearing decision worksheet in addition to a list of aggravating/mitigating factors, neither the 1987 guidelines nor the supplementing 1991 policy guidelines prohibit consideration of the unusual cruelty of the underlying offense. In fact the guidelines state that, "*[a]ny* parole release decision falling outside the numerically determined guideline shall be explained by reference to the specific aggravating or mitigating factors as stated in Appendices 2-1 *and* 2-2." D.C. Mun. Regs., Title

---

[14] The case name stated on the cover page of the deposition transcript is *Cosgrove v. Meese*, but the civil action number stated therein, No. 80-0516, corresponds with the citation above.

28, § 204.1 (emphasis added). Additionally, numerous provisions of the 1991 guidelines explicitly distinguish between factors that can be considered at initial parole hearings and factors considered at reconsideration hearings. In the section detailing unusual cruelty to victims, however, no such distinction is made and no prohibition on its consideration at reconsideration hearings is listed. *Compare* 1991 Pol'y Guidelines § VI(C)(6), *with* §§ VI(A)(1), VI(B)(1), VI(C)(7).

Fourth Circuit case law supports this reading of the 1987 guidelines. The underlying offense of a petitioner seeking parole, particularly if it involved unusual cruelty to victims, can be used as a reason to deviate from the guidelines at reconsideration hearings. *See, e.g., Holt v. United States Parole Comm'n*, No. 2:15cv529, 2016 WL 7646366, at *6 (E.D. Va. Nov. 21, 2016), *report and recommendation adopted by* 2017 WL 57133 (E.D. Va. Jan. 4, 2017) ("the 1987 Board Guidelines do not indicate that the failure to explicitly identify 'unusual cruelty' at the initial parole hearing forecloses its use at subsequent hearings"); *Blunt-Bey*, 2013 WL 6073496, at *5 (finding that the USPC did not err in using the 1987 guidelines and by indicating in its reconsideration hearing's notice of action that, "a departure from the guidelines . . . is warranted because you are [a] more serious risk than indicated by your point score in that the instant offense involved unusual cruelty to the victim."); *Malede v. Wilson*, No. 2:11cv322, 2011 WL 7091509, at *4 (E.D. Va. Dec. 14, 2011), *report and recommendation adopted by* 2012 WL 215151 (E.D. Va. Jan. 24, 2012) (unusual cruelty toward victims is considered as a factor in denying parole at petitioner's reconsideration hearing). Ultimately, the USPC complied with the 1987 guidelines by stating its permissible reasons for departure in the reconsideration hearing's notice of action. Thus, Hughes's argument that the USPC acted impermissibly by considering

the unusual cruelty of his underlying offense behavior fails because the USPC did not exceed its legal authority, act unconstitutionally, or fail to follow its own regulations.

C.     **The USPC did not exceed its legal authority, act unconstitutionally, or fail to follow its own regulations by denying parole based on Hughes's failure to complete enough significant programs to address his offense behavior.**

In addition to the unusual cruelty of the offense, the notice of action following the reconsideration hearing also states that parole was denied because Hughes had not "completed enough significant programs to address [his] offense behavior such as the [RSOTP] offered by the Bureau of Prisons." ECF No. 9-1 at 19. Hughes alleges that because the notice of action after his initial parole hearing did not mandate that he participate in the RSOTP, and because "[t]he word 'enough' is vague at best," the USPC acted arbitrarily and capriciously in its decision to deny parole. ECF No. 1 at 8–9; ECF No. 11 at 13. Hughes further alleges that the USPC has failed to consider that he "does not qualify" for the RSOTP, and that he has completed numerous institutional programs that demonstrate, "[p]etitioner's insight into, and u[n]ambiguous remorse for the damage that was caused by my criminal acts." ECF No. 1 at 8; ECF No. 11 at 13–14. Hughes asks this Court to apply an arbitrary and capricious standard to address the USPC's parole determination, however, "parole decisions are . . . not subject to arbitrary and capricious or abuse of discretion review . . . ." *Page*, 261 F. Supp. 2d at 530. Because the USPC did not exceed its legal authority, act unconstitutionally, or fail to follow its own regulations when denying parole based, in part, on Hughes's failure to complete enough significant programs, Hughes's argument fails.

To demonstrate that he did in fact complete institutional programs during the time between his initial parole hearing and his reconsideration hearing, Hughes attaches numerous certificates of completion and prison records demonstrating his participation. *See* ECF No. 12 at

54–62. This Court cannot consider whether the completion of these programs, rather than the RSOTP or programs like it, is enough to address Hughes's offense behavior because such a merit-based decision is left to the discretion of the USPC. *Ellis*, 84 F.3d at 1419–20. To the extent Hughes argues that the USPC did not consider his institutional program achievement at all, the notice of action following his reconsideration hearing does recognize that he received a one point reduction in his grid score for program participation. *See* ECF No. 9-1 at 19.

The record indicates that the USPC did not exceed its legal authority, act unconstitutionally, or fail to follow its own regulations by denying parole, despite Hughes's completion of certain programming, and the fact that the USPC, at the initial hearing, did not specify the completion of the RSOTP as a condition for grant of parole. *See Holt*, 2016 WL 7646366, at *6 (finding that the USPC could rely on factors not raised at initial parole hearings to deny parole). "[I]t is permissible for the Commission to consider Petitioner's failure to complete a sex offender treatment program as evidence of his rehabilitation or lack thereof, and denial of parole for this reason does not amount to civil commitment." *Cunningham*, 2017 WL 2061381, at *2. Therefore, the Court rejects Hughes's argument that the USPC acted impermissibly in finding his institutional program participation to be insufficient.

### III. <u>RECOMMENDATION</u>

For the foregoing reasons, the Court **RECOMMENDS** that Hughes's petition for a writ of habeas corpus, ECF No. 1, be **DENIED** and **DISMISSED WITH PREJUDICE.**

## IV. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules).

2. A district judge shall make a *de novo* determination of those portions of this Report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/
Robert J. Krask
United States Magistrate Judge

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
July 31, 2018